1  Gregory G. Spaulding, Esq. (SBN 106606)
   Terry S. Sterling, Esq. (SBN 106379)
2  SPAULDING McCULLOUGH & TANSIL LLP
   90 South E Street, Suite 200
3  P.O. Box 1867
   Santa Rosa, CA  95402
4  Telephone:     (707) 524-1900
   Facsimile:     (707) 524-1906
5  spaulding@smlaw.com; sterling@smlaw.com

6  Attorneys for Defendant
   COUNTY OF NAPA

7

8                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
9

10  GAYLE BROCK,                          Case No.:  CV 11-0257 SBA

11            Plaintiff,

12       vs.                              MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF COUNTY
13  COUNTY OF NAPA and DOES 1 through 50, OF NAPA'S MOTION FOR SUMMARY
    inclusive,                            JUDGMENT OR, IN THE ALTERNATIVE,
14                                         PARTIAL SUMMARY JUDGMENT
              Defendants.                 (Fed. R. Civ. Proc. Rule 56)
15
                                          Date: May 22, 2012
16                                         Time: 1:00 p.m.
                                          Courtroom: 1, 4th Floor, Oakland
17
                                          Trial Date: July 16, 2012
18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

I.    STATEMENT OF ISSUES ............................................................................. 1

II.   STATEMENT OF FACTS .............................................................................. 1

   A.    The Provision Of Medical And Mental Health Care To Inmates At The Napa Jail.................. 1

   B.    January 2009 Incarceration............................................................................. 2

   C.    March 2009 Incarceration.............................................................................. 4

III.  STATEMENT OF THE CASE ...................................................................... 7

IV.   ARGUMENT ................................................................................................ 8

   D.    Legal Standard For Summary Judgment ......................................................... 8

   E.    Brock's State Law Claim For Failure to Summon Medical Care Must Fail............................. 8

   F.    Brock Cannot Establish County Liability Under 42 USC §1983............................................ 10

     1.    Brock Must Demonstrate That Her Injury Was Caused By An Action Taken By The
     County Pursuant to An Official Policy Or Practice...................................................... 10

     2.    There Is No Evidence Of An Official Policy Or Practice of County Of Napa That Gives
     Rise To Liability In This Case............................................................................ 12

     3.    There Is No Evidence Of Any Omission Amounting To An Official County Policy That
     Gives Rise To Liability In This Case ................................................................... 14

       (a)    Claims Based On Alleged Errors Relating To Suicide Assessment And Prevention .... 14

       (b)    Claims Based On Alleged Errors Relating To Housing ................................. 18

       (c)    Claims Based On Alleged Errors Relating To Training................................. 19

     4.    Brock Has Not Identified Any Conduct By An Official With Final Policy-Making
     Authority That Caused A Deprivation Of Her Constitutional Rights .......................... 21

V.    CONCLUSION ............................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Albright v. Oliver*
510 U.S. 266, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) ........................................... 10

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .................................................. 8

*Baker v. McCollan*
443 U.S. 137, 99 S.Ct. 2689, fn.3, 61 L.Ed.2d 433 (1979) .......................................... 10

*Board of the County Commissioners of Bryan County, Oklahoma v. Brown*
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ............................................... 11

*Celotex Corp. v. Catrett*
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .................................................. 8

*City of Canton, Ohio v. Harris*
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ............................................... 14

*Clouthier v. County of Contra Costa*
591 F.3d 1232 (9th Cir. 2010) ...................................................................... passim

*Cochran v. Herzog Engraving Co.*
155 Cal.App.3d 405 (1984) ........................................................................ 7

*Connick v. Thompson*
____ U.S. _____, 131 S.Ct. 1350, 179 L.Ed. 417 (2011) ................................ 11, 12, 20

*Farmer v. Brennan*
511 U.S. 825, 114 S.Ct. 1970 (1994) .............................................................. 14

*Gibson v. County of Washoe, Nev.*
290 F.3d 1175 (9th Cir. 2002) .................................................................... 14

*Gillette v. Delmore*
979 F.2d 1342 (1992) ........................................................................ 12, 21

*Gonzales v. City of Peoria*
722 F.2d 468 (9th Cir. 1983) .................................................................... 11

*Kelson v. City of Springfield*
767 F.2d 651 (9th Cir. 1985) .................................................................... 10

*Leer v. Murphy*
844 F.2d 628 (9th Cir. 1988) .................................................................... 10

*Monell v. Department of Social Services*
436 U.S. 658, 98 S.Ct. 2018 (1978) ........................................................... 11, 13

*Oklahoma City v. Tuttle*
471 U.S. 808, 105 S.Ct. 2427 (1985) ............................................................. 20

*Oviatt v. Pearce*
954 F.2d 1470, 1474 (9th Cir. 1992) ........................................................... 11, 14

*Price v. Sery*
513 F.3d 962 (9th Cir. 2008) .................................................................... 12

*Quintanilla v. City of Downey*
84 F.3d 353 (9th Cir.1996) ...................................................................... 12

*Simmons v. Navajo County, Arizona*
609 F.3d 1011 (9th Cir. 2010) ................................................................... 10

*Thompson v. City of Los Angeles*
885 F.2d 1439 (9th Cir. 1989) ................................................................ 12, 15

*Watson v. State of California*
21 Cal.App.4th 836 (1993) ....................................................................... 9

**Statutes**

42 USC §1983 ................................................................................ passim
California Government Code §844.6 ............................................................. 7, 8
California Government Code §845.6 .......................................................... 1, 8, 22
California Government Code §855 ................................................................. 7
California Government Code §855.8 ............................................................... 7

California Government Code §856 ................................................................................................7
California Government Code §856.4 .............................................................................................7
California Government Code §970 ...............................................................................................7
California Government Code §971.2 ............................................................................................7

**Other Authorities**
CEB *California Government Tort Liability* §11.16 (4th Ed.) ........................................................9
FRCP, Rule 56(e) .........................................................................................................................8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

This action asserts claims arising out of the death of Scott Mostek, son of plaintiff GAYLE BROCK ("Brock"), on March 20, 2009, while Mostek was an inmate at the Napa County Jail. Pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 56, defendant COUNTY OF NAPA ("County") hereby moves for summary judgment or, alternatively, partial summary judgment, in favor of the County and against Brock.

## I.   STATEMENT OF ISSUES

The issues presented by this Motion are as follows:

1.        Whether the County deprived Brock of her Constitutional rights and if so, whether the County acted with deliberate indifference;  and

2.        Whether the County is liable to Brock for an alleged violation of California Government Code §845.6.

## II.   STATEMENT OF FACTS

A.   <u>The Provision Of Medical And Mental Health Care To Inmates At The Napa Jail</u>

The County is the governmental entity responsible for the operation of the Napa County Jail. The Napa County Department of Corrections ("NCDC"), a Department of the County, has jurisdiction over the Napa County Jail, and is responsible for the coordination of all programs and services related to the care and management of inmates.  [Declaration of D. J. Johnson ("Johnson Decl."), ¶2.]  The County contracts with California Forensic Medical Group ("CFMG") for the provision of medical care to inmates.  [Johnson Decl., ¶3; Napa County Agreement No. 4315 Professional Services Agreement ("CFMG contract") (a true and correct copy of the CFMG contract is attached as Exh. A to the Johnson Decl.)][1]  Responsibility for the provision of mental health care is shared by CFMG and the County.  A CFMG psychiatrist provides diagnostic services, medication monitoring, and 5150 evaluations of inmates, and mental health staff from Napa County Department of Corrections Mental Health Services ("NCDCMHS") provide outpatient mental health services

---

[1] This delegation of responsibility is permissible under Title 15 of the California Code of Regulations ("CCR"), pertaining to correctional facilities.  15 CCR §1006 defines "health authority" as an "individual or agency that is designated with responsibility for health care policy pursuant to a written agreement, contract or job description."

including screening, crisis intervention and counseling, as well as services relating to Safety Cell placements and restraints.  [Johnson Decl., ¶4; CFMG contract, Article 2(a) and Exh. A thereto, at section 24, as amended by Amendment No. 3 to the CFMG contract.]  Medical and mental health records for Napa Jail inmates are maintained by CFMG, which is obligated to adhere to all laws pertaining to the confidentiality of such records.  Correctional staff do not have access to inmates' medical and mental health records.  [Johnson Decl., ¶6; CFMG contract, Article 2(a) and Exh. A thereto, at section 5; First Amendment to CFMG contract, paragraph 1 (amending Article 22).] Finally, with the exception of First Aid and CPR, correctional officers are not qualified to provide, and do not provide, medical or mental health care to inmates.  [Johnson Decl., ¶5.]

B.     January 2009 Incarceration

        Mostek was originally incarcerated on January 8, 2009.  In accordance with NCDC Policy 4.004.01, a Medical Pre-Screening Questionnaire ("January 2009 Questionnaire") was completed by corrections staff.  [True and correct copies of NCDC Policy 4.004.01 and the January 2009 Questionnaire are attached to the Johnson Decl. as Exhs. F and H, respectively.]  In response to the January 2009 Questionnaire, Mostek stated that he was taking pain medications, and he indicated that he had attempted suicide more than 10 years previously, but he denied feeling suicidal at that time. Medical staff from CFMG reviewed and signed the January 2009 Questionnaire and performed a further assessment, as documented on an Intake Triage Assessment form.  [Johnson Decl., ¶8; CFMG 0064-0065.][2]

        On January 9, 2009, CFMG physician James Luders, M.D. gave orders for Mostek to be placed on opiate detox protocol, with prescribed medications for a five day period.  [CFMG 0047.] The CFMG Doctors' Orders sheet indicates that on January 14, 2009, the detox protocol was renewed for an additional three days by CMFG.  [CFMG 0047.]  While on detox protocol, Mostek was housed in a holding cell, where he was checked twice every 30 minutes by NCDC staff.  He was also regularly checked by CFMG personnel.  [Johnson Decl., ¶10 and Chrono Log, attached to the

_____

[2]  True and correct copies of cited documents produced by CFMG pursuant to subpoena are attached to the Declaration of Terry S. Sterling ("Sterling Decl.") as Exh. A.  The CFMG documents are identified herein by their Bates stamp numbers, indicated as "CFMG" followed by the number.]

1   Johnson Decl. as Exh. I; NCDC Policy 3.009.02 ("Use of Sobering Cell Logs/Observation Cell

2   Checks"), a true and correct copy of which is attached to the Johnson Decl. as Exh. D.]

3        On January 14, 2009, Mostek submitted an Inmate Request Form to CFMG, asking to be seen

4   by medical (not mental health) staff.  The Request Form stated that Mostek had a history of seizures

5   and back pain; that he had been taking Norco and Oxycontin; and that he was feeling suicidal because

6   of a deficiency of medication.  [CFMG 0058.]  Mostek was moved to a holding cell (Johnson Decl.,

7   ¶10 and Chrono Log), and he met with NCDCMHS mental health counselor Dale Gardner on January

8   15, 2009.  [Deposition of Dale Gardner ("Gardner Depo."), 44:19-45:3; 46:8-15 (true and correct

9   copies of cited pages from the Gardner Depo. are attached to the Sterling Decl. as Exh. B); Exh. B to

10   Gardner Depo. (a true and correct copy of Exh. B to the Gardner Depo. is attached to the Sterling

11   Decl. as Exh. C).]  Mostek began the January 15, 2009 interview by demanding pain medication,

12   demanding that he be taken out of the holding cell, and demanding that he be taken to court.  Mostek

13   told Mr. Gardner that he was then feeling suicidal, and that he had tried to hang himself in the past.

14   Mostek did not say if the attempt had taken place in a correctional facility or someplace else.  Mr.

15   Gardner took Mostek's statement of suicidal intent seriously and had Mostek placed in a Safety Cell

16   for his own protection.  [Gardner Depo., 49:6-51:12; Johnson Decl., ¶12 and Chrono Log.]

17        On January 16, 2009, Mr. Gardner met with Mostek in the Safety Cell.  [Gardner Depo.,

18   56:10-16; Exh. C to Gardner Depo. (a true and correct copy of Exh. C to the Gardner Depo. is

19   attached to the Sterling Decl. as Exh. D).]  Mostek recanted his prior statements and told Mr. Gardner

20   that he wasn't really suicidal; he told Mostek that he only said that he was suicidal because he

21   thought it would help him get his requested medications sooner.  Mostek denied that he had any

22   present suicidal ideation; he denied that he had been suicidal the day before; and he explained his

23   motivation for saying that he was suicidal.  Mostek contracted with Mr. Gardner not to harm himself,

24   and to cooperate with the officers.  Thereafter, Mr. Gardner cleared Mostek to leave the Safety Cell.

25   [Gardner Depo., 58:12-59:11; Exh. C to Gardner Depo.; Johnson Decl. ¶14 and Chrono Log.]

26   Mostek was released from the Napa Jail on January 19, 2009, after bail was posted.  [Johnson Decl.

27   ¶15 and Exh. I.]

28

C.     March 2009 Incarceration

Mostek was returned to the Napa Jail on March 2, 2009.  [Johnson Decl., ¶16.]  During the March incarceration, Mostek was seen by medical staff, mental health staff or both almost every day.  CFMG's chart and NCDCMHS records indicate that there were only two days on which Mostek was not seen by one or both of medical or mental health staff.  On three separate occasions, Mostek specifically denied having suicidal thoughts or ideation.  [Sterling Decl., ¶2.]

In response to the Medical Pre-Screening Questionnaire ("March 2009 Questionnaire"), Mostek denied any prior suicide attempts, and he denied that he was then feeling suicidal.  The March 2009 Questionnaire stated that Mostek had been taking pain medications and included a note indicating that Mostek would be placed on detox protocol for heroin.  [Johnson Decl., ¶16 and Exh. J to Johnson Decl.]  On March 3, 2009, Dr. Luders gave an order putting Mostek on the five day opiate detox protocol (CFMG 0007), and Mostek was placed in a holding cell.  [Johnson Decl. ¶17.]  On March 8, 2009, the day the detox protocol was scheduled to end, Mostek submitted an Inmate Request Form seeking a renewal of his medications, and on March 9, 2009, CFMG renewed the detox protocol for an additional two days.  [CFMG 0007.]

Also on March 9, 2009, following completion of the initial orders for detox protocol, Mostek was moved from a holding cell to a special housing cell (Cell 1 in Tank 1).  Tank 1 is a group of 8 cells that surround and open into a central day room, where the inmates housed in Tank 1 have their out of cell activity time.  The doors to the cells are barred, not solid, so when the inmates are in their cells, each inmate can see into the day room and into some of the other cells, and they can hear and speak to each other.  The door into Tank 1 is also barred, so correctional officers and other persons in the hallway outside of Tank 1 can hear the inmates housed in the Tank 1 cells.  Cell 1 is the cell that is closest to the door exiting from Tank 1 into the hallway.  [Johnson Decl. ¶18.]

On March 11, 2009, when the detox medications were again scheduled to end, Mostek submitted two Inmate Request Forms to CFMG, one asking to see medical staff and one asking to see mental health staff.  Both forms sought medications  The first form was a request to see medical staff to get medication for back pain.  [CFMG 0032.]  CFMG responded to Mostek's request for medical attention on March 13, 2009, advising that Mostek needed to give CFMG the name and location of

1    his treating physician and to sign a release of information so CFMG could get his medical history.

2    [CMFG 0032.]  Mostek submitted another Inmate Request Form to CFMG on March 13, 2009,

3    requesting a double mattress due to degenerated and herniated disks; stating that he needed a CAT

4    scan and X-ray due to chronic back pain; and stating that he needed Neurontin and/or SOMA for

5    pain.  CFMG staff saw Mostek on March 14, 2009 and on that same day, CFMG responded in

6    writing.  CFMG Progress Notes and the response to Mostek's March 13 form indicate that CFMG

7    staff agreed to fax North Bay Regional to obtain information about Mostek's prior treatment for back

8    pain; they advised Mostek that he would need to pay for his own Gabapentin (Neurontin) if the

9    doctor ordered it; and they referred Mostek's request for a second mattress to Dr. Luders.  [CFMG

10   0029, 0031.]

11        CFMG staff saw Mostek again on March 16 and 17, 2009.  Progress Notes from March 17,

12   2009 state that Mostek was seen for complaints of pain.  Mostek told CFMG staff that he wanted

13   Neurontin, SOMA or Norco or, if he could not have any of those medications, Baclofen; Mostek said

14   he had taken these medications previously.  [CFMG 0028.]  Also on March 17, CFMG staff

15   completed a Health Inventory and Communicable Disease Screening indicating that Mostek denied

16   that he was then having any suicidal thoughts, and he denied any history of suicide attempts.  [CFMG

17   0041-0042.]

18        Mostek's second Inmate Request Form submitted on March 11, 2009 was a request to see

19   mental health staff to get medication to calm down.  [CFMG 0036.]  When Mostek was seen by Dale

20   Gardner on March 16, 2009, he told Mr. Gardner that he needed Neurontin because it "keeps me on

21   an even keel."  [Gardner Depo. 67:12-22 and Exh. D to Gardner Depo. (a true and correct copy of

22   Exh. D to the Gardner Depo. is attached to the Sterling Decl. as Exh. E).]  Mr. Gardner is a Marriage

23   Family Therapist, not a physician, and he cannot prescribe medication.  Accordingly, he referred

24   Mostek to the CFMG telepsychiatrist for an appointment regarding his request for Neurontin.

25   [Gardner Depo., 69:9-16 and Exh. E to Gardner Depo. (a true and correct copy of Exh. E to the

26   Gardner Depo. is attached to the Sterling Decl. as Exh. F).]  As part of his standard assessment,

27   Mr. Gardner asked Mostek if he was then having any suicidal thoughts or ideation, and Mostek

28   responded that he was not.  In response to routine questions about any history of suicidal thoughts or

1   attempts, Mostek told Mr. Gardner that he had been placed in a Safety Cell for suicidal ideation

2   during his January 2009 incarceration.  He also told Mr. Gardner that he had cut his wrists at that

3   time, but Mr. Gardner had seen Mostek in January 2009, and he knew that Mostek had not cut his

4   wrists.  [Gardner Depo., 68:13-71:8; 76:8-15 and Exh. D to Gardner Depo.][3]

5          Mostek had a teleconference appointment with Dr. Stancil Johnson, the CFMG psychiatrist,

6   on March 18, 2009 regarding Mostek's request for Neurontin.  [Deposition of Stancil Johnson, M.D.,

7   ("Dr. Johnson Depo."), 24:2-6 and Exh. E to Gardner Depo. (true and correct copies of cited pages

8   from the Dr. Johnson Depo are attached to the Sterling Decl. as Exh. G).]  Mostek told Dr. Johnson

9   that he was facing a third strike; that he had a history of being bipolar; and that he had previously

10  taken Neurontin because of seizures.  Dr. Johnson noted that although Mostek was seeking Neurontin

11  for a medical condition, he had not been evaluated by CFMG for that condition, so Dr. Johnson

12  ordered a medical evaluation by CFMG.  In the meantime, Dr. Johnson gave Mostek a prescription

13  for doxepin, a mild antidepressant.  Dr. Johnson noted that he would consider further Mostek's

14  claimed history of being bipolar, and he would await the results of CFMG's seizure evaluation.

15  [Johnson Depo., 25:21-26:9.]

16         On the evening of March 19, at approximately 6:40 p.m. and 7:00 p.m., Mostek had two

17  telephone conversations with a friend, Wesley Quiroz.  Mr. Quiroz testified that the conversations

18  related to a plan for Mostek to trade information regarding the identity of the murderer in an unsolved

19  Napa County murder case in exchange for a dismissal or reduction of the charges against him, so he

20  could avoid the three strikes sentence.  During those phone calls, Mr. Quiroz and Mostek agreed that

21  the next day Mr. Quiroz would call Mostek's attorney and others to move the plan forward, and

22  Mostek would arrange for "motivation" (crystal meth, according to Mr. Quiroz), to be sent to Mr.

23

24  _____

[3]   At Mr. Gardner's deposition, plaintiff's attorney suggested that Mostek may have cut his wrists after he saw Mr. Gardner
25  on January 16 and before he was released on January 19.  Mr. Gardner testified that if Mostek had been treated by CFMG
    for cut wrists, there would be a medical record reflecting that treatment (Gardner Depo., 72:18-20); CFMG's chart does
26  not include any records indicating that Mostek was treated for cut wrists, in January 2009 or at any time.  [Sterling Decl.
    3.]  Mr. Gardner said it was his standard practice to check with CFMG to validate an inmate's claim of physical injury,
27  and he remembered speaking to CFMG about Mr. Gardner.  CFMG staff discussed Mostek's back problems, but they did
    not tell Mr. Gardner that Mostek had been seen or treated for cut wrists.  [Gardner Depo., 74:14-75:3.]

28

1  Quiroz' home for use in facilitating the plan.  [Deposition of Wesley Quiroz, 59:7-70:22 (true and

2  correct copies of cited pages from the Quiroz Depo are attached to the Sterling Decl. as Exh. H).]

3      Also on the evening of March 19, Mostek had a brief conversation with Officer Kevin

4  Skillings.  Officer Skillings testified that he did not detect anything out of the ordinary in Mostek's

5  demeanor.  Mostek was quiet and kept to himself, which was consistent with his usual behavior.

6  [Deposition of Kevin Skillings, 11:20-15:2 (true and correct copies of cited pages from the Skillings

7  Depo are attached to the Sterling Decl. as Exh. I).]

8      During a routine safety and security check at approximately 2:30 a.m. on March 20, 2009,

9  Correctional Officer Adam Rusin found Mr. Mostek hanging in his cell.  Officer Rusin radioed for

10  assistance and cut Mostek down.  Within a minute or so, several NCDC officers and a CFMG nurse

11  responded, and emergency assistance was called.  [Deposition of Adam Rusin 14:20-17:15 (true and

12  correct copies of cited pages from the Rusin Depo are attached to the Sterling Decl. as Exh. J).]  The

13  nurse examined Mostek and found no pulse and no heartbeat; two of the officers noted in their reports

14  that they heard the nurse say "he's gone."  The officers performed CPR until the paramedics arrived;

15  shortly after they arrived, the paramedics declared Mostek dead.  [Exh. K to Johnson Decl.]

16                          III.  STATEMENT OF THE CASE

17      This original Complaint in this action, which case was filed in state court, alleged a single

18  cause of action for wrongful death.  The County demurred on the ground that it is immune from

19  liability for wrongful death under California Government Code §844.6, which provides that a public

20  entity is not liable for injury to a prisoner.  On or about October 16, 2010, before the demurrer was

21  heard, plaintiff filed her First Amended Complaint, adding claims under California Government Code

22  §§856.4, 855, 856, 855.8, 970 and 971.2.  The County again demurred on the ground that these

23  provisions of the Government Code do not constitute exceptions to §844.6 immunity, which

24  establishes a general principle of non-liability for public entities with respect to claims for injuries to

25  prisoners.  *Cochran v. Herzog Engraving Co.*, 155 Cal.App.3d 405, 409 (1984).

26      On or about January 13, 2011, plaintiff filed her Second Amended Complaint, alleging six

27  claims for relief.  Only two of those claims are alleged against the County (the first claim for relief, a

28  federal civil rights claim under 42 USC §1983, and the second claim for relief, for failure to summon

1   medical care under California Government Code §845.6).  The County is immune from liability for

2   the remaining claims under Government Code §844.6, and those claims are alleged only against Doe

3   defendants.  The County removed this case to federal court on January 18, 2011, on the basis of

4   plaintiff's inclusion of a federal claim.

## IV.   ARGUMENT

### D.   Legal Standard For Summary Judgment

7           Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories,

8   and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

9   any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP, Rule

10  56(c).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

11  return a verdict for the nonmoving party.  "To show the existence of a 'genuine' issue, ... [a plaintiff]

12  must produce at least some significant probative evidence tending to support the complaint."

13  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

14          A party seeking summary judgment bears the initial burden of informing the court of the basis

15  for its motion, and identifying those portions of the pleadings and discovery responses that

16  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

17  323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  On an issue where the nonmoving party will bear the

18  burden of proof at trial, the moving party can prevail merely by pointing out to the court that there is

19  an absence of evidence to support the nonmoving party's case.  *Id*.  It is then the opposing party's

20  burden to set forth specific facts showing that there is a genuine issue of material fact for trial in order

21  to defeat the motion.  FRCP, Rule 56(e); *Anderson, supra*, 477 U.S. at 250.

### E.   Brock's State Law Claim For Failure to Summon Medical Care Must Fail

23          Brock seeks damages under the Second Cause of Action based on an alleged failure to

24  summon medical care in violation of California Government Code §845.6.  Under §845.6, a public

25  entity is not liable for injury caused by a public employee's failure to furnish or obtain medical care

26  for a prisoner *unless*: (1) the employee knows or has reason to know that a prisoner is in need of

27  immediate medical care, and (2) the employee fails to take reasonable action to summon such care.

28  Liability under §845.6 is limited to situations where an employee intentionally or unjustifiably fails to

---

1   summon immediate medical care.  *Watson v. State of California*, 21 Cal.App.4th 836, 841 (1993).

2   Whether the medical care that was provided was adequate is not the determinative issue under

3   §845.6; the only issue is whether medical assistance was summoned.  CEB *California Government*

4   *Tort Liability*, §11.16 (4th Ed.)  Liability cannot be imposed under §845.6 against a County because

5   its correctional officers, who are not medically trained professionals, did not second guess or question

6   the medical or mental health care provided by professionals who saw an inmate.  "Section 845.6 does

7   not require that a prison guard be a better medical diagnostician" than the medical personnel treating

8   the inmate.  *Watson v. State of California, supra*, 21 Cal.App.4th at 842-843.  "Prison authorities do

9   not have the medical training to know whether a prisoner's medical condition has been properly

10  diagnosed or treated."  *Id*. at 843.

11       Liability under §845.6 is limited to situations involving "serious and obvious" medical

12  conditions that require "immediate care."  *Id.* at 841.  The County does not deny that if, prior to his

13  death on March 20, Mostek had been suicidal in March 2009, that condition would qualify as

14  "serious."  However, there is no evidence that was obvious.  As is set forth above, during his

15  incarceration from March 2 to March 20, 2009, Mostek was seen by medical staff, mental health staff

16  or both on all but two days.  On three separate occasions, he was asked about and denied suicidal

17  thoughts or ideation.  Under these circumstances, where medical and mental health staff who saw

18  Mostek on an almost daily basis did not identify Mostek as being suicidal, it cannot be said that it

19  was obvious to the correctional officers, who are not trained medical or mental health professionals,

20  that Mostek was at serious risk for suicide.

21       Moreover, there is no evidence that Mostek required "immediate care" in March 2009.  To the

22  contrary, both of plaintiff's experts testified that Mostek was not at such a level of risk that immediate

23  care was needed.  Brock's mental health expert, Martin H. Williams, Ph.D., testified that there are

24  levels of suicidality, and characterized some individuals as being "imminently suicidal," meaning the

25  individual's condition is such that a clinician would have the impression that if left alone, the

26  individual might commit suicide immediately.  [(Deposition of Martin H. Williams, Ph.D. ("Williams

27  Depo."), 36:21-37:25 (true and correct copies of cited pages from the Williams Depo. are attached to

28  the Sterling Decl. as Exh. K).]  According to Dr. Williams, an individual in that condition would need

1    to be put in a safety cell "right now."  In other words, the individual required immediate care.  Dr.

2    Williams did not believe that Mostek fell into that class of person.  [Williams Depo., 51:9-52:10;

3    57:11-58:5.]  Although it is questionable if Brock's correction expert, Jeffrey R. Hislop, has the

4    expertise necessary to provide opinion testimony regarding suicidality (he is not a medical or mental

5    health professional), Mr. Hislop testified that he did not think Mostek was "in crisis," a condition that

6    would have required immediate transfer to a Safety Cell.  [(Deposition of Jeffrey R. Hislop ("Hislop

7    Depo."), 76:20-77:10 (true and correct copies of cited pages from the Hislop Depo. are attached to

8    the Sterling Decl. as Exh. L).]

9    F.    <u>Brock Cannot Establish County Liability Under 42 USC §1983</u>

10        The First Cause of Action seeks damages under 42 USC §1983 for an alleged violation of

11    Brock's due process rights.  While not specifically referenced in the Second Amended Complaint,

12    Brock's claim necessarily invokes the Fourteenth Amendment, because Mostek was a pre-trial

13    detainee at the time he committed suicide.  *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1017

14    (9th Cir. 2010).  Brock's claim is a claim for a violation of <u>her</u> Constitutional rights, not a survivor

15    claim based on a violation of Mostek's rights, and it is therefore based on the County's alleged

16    deprivation of Brock's interests in her familial relationship with Mostek, and in the loss of his love,

17    society, services, support and companionship.  [Second Amended Complaint, ¶15.]  *See Kelson v.*

18    *City of Springfield*, 767 F.2d 651, 653-655 (9th Cir. 1985).

19        1.    <u>Brock Must Demonstrate That Her Injury Was Caused By An Action Taken By The</u>

20            <u>County Pursuant to An Official Policy Or Practice</u>

21        Section 1983 is not itself a source of substantive rights, it "merely provides 'a method for

22    vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct.

23    807, 811, 127 L.Ed.2d 114 (1994), citing *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689,

24    2694, fn.3, 61 L.Ed.2d 433 (1979).  A defendant deprives a plaintiff of her constitutional rights

25    within the meaning of §1983 if the defendant "does an affirmative act, participates in another's

26    affirmative acts, or omits to perform an act which [the defendant] is legally required to do that causes

27    the deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  To establish a §1983 claim

28    against a public entity, the plaintiff must prove that the deprivation of constitutional rights was the

1  result of an act or omission legally attributable to the entity itself.  *Board of the County*

2  *Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400, 117 S.Ct. 1382, 137

3  L.Ed.2d 626 (1997) ("in enacting §1983, Congress did not intend to impose liability on a

4  municipality unless deliberate action attributable to the municipality itself is the 'moving force'

5  behind the plaintiff's deprivation of federal rights"); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.

6  1992).

7  　　　For purposes of a claim under §1983, the acts and omissions of a public entity's employees

8  are <u>not</u> legally attributable to the public entity.  The public entity is not liable for the conduct of its

9  employees, because the doctrine of *respondeat superior* is not applicable to an action under §1983.

10  *Monell v. Department of Social Services*, 436 U.S. 658, 691-694, 98 S.Ct. 2018, 2036-2038 (1978);

11  *Connick v. Thompson*, ____ U.S. _____, 131 S.Ct. 1350, 1359, 179 L.Ed. 417 (2011).  Therefore,

12  even if Brock could prove that one or more County employees was negligent or otherwise acted

13  wrongfully by failing to conclude that Mostek was suicidal, by housing Mostek improperly or by

14  failing to take other measures to prevent Mostek's suicide, such conduct would not support a §1983

15  claim against the County.

16  　　　Where the defendant is a governmental entity, it is responsible under §1983 only when

17  execution of the governmental entity's established policy or practice inflicts the constitutional injury.

18  *Monell v. Department of Social Services, supra*, 436 U.S. at 663 n.7, 691 (prison authorities are not

19  liable for the actions of their employees absent some evidence of a policy or practice mandating the

20  action), *Gonzales v. City of Peoria*, 722 F.2d 468, 479-80 (9th Cir. 1983) (local government liable

21  under §1983 only if the injury is inflicted pursuant to government policy or custom.)  Therefore,

22  Brock must prove that there was an official policy or longstanding practice of the County that, by its

23  implementation, resulted in the constitutional injury allegedly suffered by her.

24  　　　There are three ways that a governmental policy or practice can give rise to public entity

25  liability under §1983.  First, a public entity may be liable where implementation of an official policy

26  or practice inflicts the constitutional injury.  *Clouthier v. County of Contra Costa*, 591 F.3d 1232,

27  1249 (9th Cir. 2010).  To prevail on this theory, a plaintiff must provide evidence of either a specific

28  policy or a longstanding practice that, by its implementation, resulted in a constitutional injury.

1    *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir.1996).   When a plaintiff seeks to rely on a

2    custom or practice rather than an official policy as the basis for a §1983 action, the plaintiff must

3    provide evidence of a pre-existing, longstanding practice or custom that constitutes the standard

4    operating procedure of the public entity. *Clouthier v. County of Contra Costa, supra*, 591 F.3d at

5    1249 and 1251; *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (plaintiffs may establish municipal

6    liability "by demonstrating that ... the constitutional tort was the result of a longstanding practice or

7    custom which constitutes the standard operating procedure of the local government entity");

8    *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989).   Evidence of random acts or

9    isolated events is not sufficient to prove that a particular practice is "so permanent and well settled as

10   to constitute a 'custom or usage' with the force of law." *Gillette v. Delmore*, 979 F.2d 1342, 1329 and

11   1348-1349 (1992).

12        The second way to show public entity liability under §1983 is to show an "omission" or

13   "policy of inaction" of the public entity, when such omission amounts to the local government's

14   official policy. *Clouthier v. County of Contra Costa, supra*, 591 F.3d at 1249; *Connick v. Thompson,*

15   *supra,* 131 S.Ct. at 1359.

16        Finally, a public entity may be held liable under §1983 when an official with final policy-

17   making authority ratified both a subordinate's unconstitutional action and the basis for it. *Clouthier v.*

18   *County of Contra Costa, supra*, 591 F.3d at 1250.

19        2.   <u>There Is No Evidence Of An Official Policy Or Practice of County Of Napa That</u>

20             <u>Gives Rise To Liability In This Case</u>

21        Brock's claimed injury is the loss of her son, who killed himself while he was an inmate at the

22   Napa County Jail.  The Second Amended Complaint alleges that unnamed County employees (Does

23   1-25) were informed, believed or had knowledge to a substantial certainty that Mostek would commit

24   suicide after being placed in a cell with a bed sheet or similar item, and that those employees acted

25   with deliberate indifference to Mostek's life by placing him in a cell with a bed sheet or similar item

26   after Mostek stated that he would terminate his life.  [Second Amended Complaint, ¶11.]  These

27   claims have not been substantiated through discovery.  There has been <u>no evidence</u> that during his

28   March 2009 incarceration, Mostek told any County employee that he intended to end his life.

1    Moreover, even if these allegations were proven true, they would not establish public entity liability

2    under §1983.  At most, the alleged conduct  might constitute wrongdoing on the part of one or more

3    County employees, but under §1983 the County is not vicariously liable for the wrongful conduct of

4    individual employees.  *Monell v. Department of Social Services*, *supra*, 436 U.S. at 691-694.

5           The Second Amended Complaint also alleges that Mostek's death was caused by the County

6    "because of its official policies; and its custom and practices, which were followed by defendant

7    employees Does 1-12."  [Second Amended Complaint, ¶12.]  In response to an Interrogatory asking

8    Brock to identify the specific facts and documents that support this allegation, Brock was unable to

9    cite any supporting evidence of which she had personal knowledge.  Rather, she responded that she is

10   informed and believes that County staff placed Mostek in a cell with a bedsheet, even though they

11   knew that Mostek was suicidal, and that they did so because there is no County policy addressing

12   how to handle such situations and because County staff were not properly trained regarding such

13   situations.  Brock did not identify any official County policy or practice, the implementation of which

14   is alleged to have caused Mostek's death.

15          Finally, neither of Brock's experts in this case opined that any official County policy operated

16   to cause Mostek's death.  To the contrary, Mr. Hislop testified that he did not have any criticism of

17   the County's policies regarding the management of suicidal inmates.  [Hislop Depo., 61:17-62:12].

18   Dr. Williams also does not claim that Mr. Gardner was acting pursuant to any established County

19   policy; when he was asked if he had any criticism of the County's policies and procedures, Dr.

20   Williams did not identify any policies or procedures relating to Mr. Gardner's care that Dr. Williams

21   believed to be improper.  [Williams Depo., 67:23-68:22.]

22          Accordingly, based on the allegations of Brock's Second Amended Complaint, information

23   provided in response to non-expert discovery and the opinions of Brock's experts, there are no

24   allegations and there is no evidence of either a specific policy or a longstanding practice that, by its

25   implementation, is alleged to have caused Mostek's death.

26

27

28

3.   There Is No Evidence Of Any Omission Amounting To An Official County Policy That Gives Rise To Liability In This Case

As noted above, a public entity may also be found liable under §1983 based on an "omission" by a public entity, if that omission amounts to the local government's official policy.  This does not mean that there is liability under §1983 whenever a public entity fails to do some specific thing that would have avoided harm.  A public entity is not liable under §1983 anytime there is an omission or oversight; after all, in "virtually every instance where a person has had his… constitutional rights violated by a [public] employee, a §1983 plaintiff will be able to point to something the [public entity] 'could have done' to prevent the unfortunate incident."  *Clouthier v. County of Contra Costa*, *supra*, 591 F.3d at 1250.  Instead, a plaintiff must prove that the omission in question constitutes an official policy of the public entity.  *Id*. at 1249.

In this case, Brock must show that there was a custom or policy of omission that amounted to deliberate indifference (*Farmer v. Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970 (1994)); that the County had actual or constructive notice that the omission would likely result in a constitutional violation (*Id.*); and that the omission was the moving force behind the violation of Brock's constitutional rights.  To prove that an omission was the moving force behind the constitutional injury, Brock must show that there was a deficiency in the County's policies or practices that was "closely related to the ultimate injury," (*City of Canton, Ohio v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)), and that the injury would have been avoided if the County had had some specific identified policy.  *Oviatt v. Pearce,* 954 F.2d 1470, 1478 (9th Cir. 1991); *Gibson v. County of Washoe, Nev*., 290 F.3d 1175, 1193-1194 (9th Cir. 2002).

(a)   Claims Based On Alleged Errors Relating To Suicide Assessment And Prevention

Brock contends that the County did not have a policy addressing the housing and management of suicidal inmates, and that County staff were not properly trained with respect to the housing and management of suicidal inmates.  If these contentions were true, they might arguably support a §1983 claim based on an "omission" or "policy of inaction."  However, these allegations are demonstrably

1   false, since the County <u>does</u> have policies that deal with the management of suicidal inmates, and

2   NCDC Correctional Officers <u>are</u> trained with respect to those policies.

3           The policies that fall under NCDC Policy 3.010.00, "Suicidal Inmates," provide information

4   regarding the identification, placement and handling of inmates who are considered to be suicide

5   risks.  Under NCDC Policies 3.010.01 and 3.010.02, entitled "Identification" and "Placement," an

6   inmate who is identified as a possible suicide risk may be placed in a Safety Cell and in that case, a

7   mattress and blanket shall <u>not</u> be placed in the Safety Cell with the inmate.  [Exh. E to Johnson

8   Decl..]  At the beginning of their employment with NCDC, Correctional Officers are required to read

9   and become familiar with NCDC Policies and Procedures, including the policies relating to suicidal

10  inmates.  [Johnson Decl., ¶20.]  NCDC Correctional Officers are also required to complete all

11  training that is required by Title 15 of the CCR, including the Corrections Officer Core Course and

12  required annual training.  The Corrections Officer Core Course includes training relating to mental

13  health issues, including suicide prevention.  [Johnson Decl., ¶¶20-21.]

14          Although Mr. Hislop is not critical of the County's policies regarding the management of

15  suicidal inmates, he is critical of the NCDC for allegedly failing to follow NCDC policy 3.010.01,

16  pertaining to the identification of inmates who are suicide risks.  [Expert Opinion Report of Jeffrey R.

17  Hislop ("Hislop Report"), Opinion No. 1, p. 5.  A true and correct copy of the Hislop Report is

18  attached to the Sterling Decl. as Exh. M.]  If Brock could prove that County staff had failed to follow

19  NCDC policies regarding the management of suicidal inmates, <u>and</u> that not following those policies

20  is a "longstanding practice or custom which constitutes the standard operating procedure" of the

21  County (*see*, *Thompson v. City of Los Angeles*, *supra*, 885 F.2d at 1444), that might constitute an

22  "omission" or "policy of inaction" sufficient to support a §1983 claim against the County.  However,

23  the evidence in this case does not support such a claim.

24          NCDC policy 3.010.01 provides:

25

26          "Identification of inmates who are suicide risk *may* include, but are not
            limited to, an examination of available records, observations of
27          arresting law enforcement officers, correctional staff, inmates, and
            written and verbal statements by the inmate of an intent to commit self
28          harm or self-injury.  Examples of *possible* high risk inmates are first
            time in jail, anyone self-identifying as suicidal, anyone with a history of

1    suicide attempts, individuals who think they are facing a third strike or
conviction of a long duration, homicides involving family members,
2    inability to sleep and unprovoked attacks." (italics added)

3         The language of the policy is not mandatory; it does not require that if a certain number of

4    risk factors are found to exist, then an inmate must be considered suicidal or the inmate must be

5    housed or treated in a certain way.  Rather, the policy provides guidance and examples of the kind of

6    factors to be considered in assessing an inmate with respect to possible suicidality.

7         Mr. Hislop testified that in March 2009, several of the factors identified in NCDC policy

8    3.010.01 were present, including: Mostek made statements of an intent to commit self-harm; he self-

9    identified as suicidal; he had a history of suicide attempts; and he was facing a third strike conviction

10   with a sentence of long duration. [4]  Dr. Williams also concluded that there were several factors

11   indicating that Mostek was a "high suicide risk," although the factors cited by Dr. Williams were not

12   derived from NCDC policy 3.010.01.  Dr. Williams identified the relevant factors as: making suicidal

13   statements, having a history of suicide attempts, suffering from significant mental illness, facing a

14   third strike and withdrawing from drug addiction. [5]  [Expert Opinion of Martin Williams, Ph.D.

15   ("Williams Report"), Section IV(A).  A true and correct copy of the Williams Report is attached to

16   the Sterling Decl. as Exh. N.]  Based on the factors they identified, Mr. Hislop concluded that the

17   Correctional Officers should have identified Mostek as a suicide risk (Hislop Depo., 65:12-76:19),

18   and Dr. Williams concluded that mental health worker Dale Gardner should have known that Mostek

19   was a suicide risk (Williams Depo., 67:23-68:22).

20        The analysis of suicide risk performed by each of Brock's experts is highly specific to

21   Mostek's situation.  Each of the experts identified risk factors based on the specifics of Mostek's

22   history and his situation in March 2009.  The Correctional Officers and Mr. Gardner did not reach the

23   same conclusions as Brock's experts, nor do the County's experts (corrections expert Joseph Caruso

---

24   [4]  Mr. Hislop's opinions are directed only to the Correctional Officers, not mental health staff.   Mr. Hislop's expertise is
25   in the field of law enforcement,  not mental health care.  By his own admission, Mr. Hislop is not qualified to offer
opinions regarding medical or mental health care and treatment.  [Hislop Depo., 26:16-29:5.]

26   [5]  Dr. Williams' opinions are directed only to mental health staff, not the Correctional Officers.  Dr. Williams is not
qualified to offer any expert opinions regarding the conduct of correctional staff.  Dr. Williams said that he would feel
27   qualified to express an opinion regarding the conduct of a correctional officer if the officer was carrying out a request
made by the mental health staff, but in this case, Dr. Williams did not recall that the officers were asked to carry out any
28   such instructions.  [Williams Depo., 18:1-19:22.]

1    and psychiatrist Bruce Victor M.D.) agree with that analysis.  [March 1, 2012 letter report from

2    Joseph Caruso to Terry S. Sterling ("Caruso Report") and March 1, 2012 letter report from Bruce S.

3    Victor, M.D. to Terry S. Sterling ("Victor Report").  True and correct copies of the Caruso Report

4    and the Victor Report are attached to the Sterling Decl. as Exhibits O and P, respectively.]  As Dr.

5    Williams testified, the assessment of an individual's risk for suicide is a judgment call that has to be

6    made on the basis of the available information, and someone who meets with the individual being

7    assessed is in the best position to make that assessment, better than someone who is simply reviewing

8    documents about the individual.  [Williams Depo., 46:15-47-25.]

9            Given the individualized and personal nature of a suicide assessment performed by

10   corrections staff under NCDC policy 3.010.01 or by mental health professionals in accordance with

11   their training and expertise, and the fact the determination is a judgment call that must be based on

12   consideration of various factors, rather than simply checking items off a list, the evidence and Brock's

13   experts' opinions do not establish that County employees failed to follow NCDC policy 3.010.01 in

14   connection with their assessment of Mostek.  At most, it shows that County staff dealing with Mostek

15   in 2009 reached different conclusions than Brock's experts reached based on their review of

16   documents relating to Mostek.  Even if the conclusions of the County's employees were found to be

17   incorrect, such incorrect conclusions by County employees does not provide a basis for County

18   liability under §1983.  As set forth above, the County is not vicariously liable under §1983 for the

19   negligence or wrongful conduct of its individual employees.

20           The evidence and the opinions of Brock's experts regarding the County's assessment of

21   Mostek do not establish the existence of a "longstanding practice or custom" of failing to follow

22   NCDC policy 3.010.01 or any other County policy.  There is no evidence that suicide assessments are

23   performed improperly, or in disregard of the County's policies, as a matter of routine, so as to

24   constitute the "standard operating procedure" of the County.  However, such proof is essential to

25   establish a claim against the County under §1983.  Brock's allegations, her experts' opinions and the

26   evidence developed in this case relate to the correctness of decisions made by individual County

27   employees with respect to Mostek, not to the existence of any established policy or practice.

28

1              (b)       Claims Based On Alleged Errors Relating To Housing

2          The other primary issue raised by Brock's experts (apart from suicide assessment) is inmate

3     housing.  Both of Brock's experts were critical of the County's decisions regarding Mostek's

4     placement and housing in March 2009, and both opined that Mostek should have been placed in a

5     Safety Cell throughout his incarceration in March 2009.  [Hislop Report, Opinion No. 2; Williams

6     Report, Section IV (B).]  Mr. Hislop's Opinion No. 2 states that a Safety Cell would have been "the

7     ideal placement" for Mostek, and if Mostek was not placed in a Safety Cell, then he should have been

8     housed "in an environment with others," and not in an "isolation cell" where there was no way of

9     alerting staff.  Dr. Williams' opinion "B" states that Mostek should have been kept in a Safety Cell, or

10    at least in a cell with other inmates, or confined in such a way that other inmates could easily call for

11    help.

12         Brock's contentions that Mostek was not placed in the right kind of cell, or that he should

13    have been housed differently or observed more closely, are necessarily based on claims of errors by

14    the individual County employees who made housing decisions regarding Mostek.  Just as Brock's

15    claims of wrongdoing with respect to the Correctional Officers' and mental health workers'

16    assessments of Mostek's suicide risk cannot support a §1983 claim against the County, claims based

17    on individual housing decisions also will not support a claim under §1983.  Neither Brock nor her

18    experts have identified any official County policy relating to housing that caused Mostek's death, nor

19    have they proven the existence of any longstanding practice or custom relating to housing that

20    constitutes a standard operating procedure of the County, the implementation of which resulted in

21    Mostek's death.  Such proof is essential to establish a claim against the County under §1983.

22         Mr. Hislop's Opinion No. 3 is that the NCDC has a custom or practice of not utilizing the

23    NCDC's suicide prevention policy, and of  promoting deliberate indifference by Jail staff.  Mr. Hislop

24    testified that this opinion is largely the same as Opinions Nos. 1 (regarding suicide assessment) and

25    No. 2 (regarding housing issues), but it identifies broader County practices.  [Hislop Depo., 97:1-11.]

26    In support of that opinion, the Hislop Report refers to unidentified articles regarding the Jail's ability

27    to handle mentally ill inmates.  Neither the Report nor Hislop's deposition testimony provided any

28    more specific information about those articles, so they cannot be used as support.

1   The Report also notes that there were two suicides, and allegedly three suicide attempts, at the

2   Napa Jail in 2009, which Mr. Hislop claims is a significantly high percentage for a jail of its size.

3   Mr. Hislop testified that those statistics constitute a custom or practice of failing to recognize and

4   properly house high suicide risk inmates.  [Hislop Depo., 97:1-21.]  Mr. Hislop testified that he did

5   not consider statistics relating to suicides at the Napa Jail for any other years, but only for a single

6   year.  [Hislop Depo., 99:17-101:2.]  Statistics for a single year do not prove the existence of a

7   "longstanding practice or custom" as is required for liability under §1983.  Also, such statistics are

8   meaningless without context.  Mr. Hislop cited the fact that there were two suicides and three

9   attempts in 2009 as evidence that the County had a custom and practice of failing to recognize and

10  properly house high suicide risk inmates, but he did not have any information regarding the

11  circumstances surrounding any of those events except Mostek's suicide.  [Hislop Depo., 102:1-8.]

12  Without having information regarding the other inmates, including their risk for suicide and where

13  they were housed, there is no basis for drawing specific conclusions regarding County practices

14  relating to suicide assessments or housing.

15  Dr. Williams testified that inmates who are at risk for suicide require "continuous

16  observation."  He testified that this is true not only for inmates who are placed in Safety Cells

17  because they are "imminently suicidal," but for all inmates who present a risk of suicide, regardless

18  of the level or degree of risk presented.  [Williams Depo., 34:25-38:23.]  Dr. Williams' testimony

19  should be disregarded because he is not qualified to testify with respect to jail housing practices.  Dr.

20  Williams conceded that he does not have any expertise with respect to jail design and policies for

21  observation of inmates; he said that his relevant expertise is in managing suicidal people.  Dr.

22  Williams did not know what state law requires with respect to the frequency of observing suicidal

23  inmates.  [Williams Depo., 40:21-41:9.]  In fact, under Title 15, there is no requirement for

24  "continuous observation."  Inmates who are housed in Safety Cells based on a risk of suicide are

25  subject to direct visual observation twice every 30 minutes.  [Johnson Decl. ¶13.]

26         (c)    Claims Based On Alleged Errors Relating To Training

27  The final area of criticism by Brock or her experts relates to training.  In that regard, Mr.

28  Hislop's Opinion No. 4 is that Napa Jail staff did not receive adequate training in suicide prevention

1   and CPR.[6]  [Hislop Report, Opinion 4.]  The standard for a failure to train claim is stringent and is

2   only to be applied in very limited instances which are not present in the matter at bench.  As the

3   United States Supreme Court recently stated in *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011),

4   "[i]n  limited circumstances, a local government's decision not to train certain employees about their

5   legal duty to avoid violating citizens' rights may rise to the level of an official government policy for

6   purposes of §1983."  However, where a claim turns on a failure to train, a public entity's culpability

7   for a section 1983 violation "is at its most tenuous."  *Connick*, at 1359, see also, *Oklahoma City v.*

8   *Tuttle*, 471 U.S. 808, 822–823, 105 S.Ct. 2427 (1985).

9           To establish a §1983 claim based on a failure to train, the public entity's "failure to train its

10  employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with

11  whom the [untrained employees] come into contact.'"  *Id.*, at 1359-1360. Deliberate indifference "is a

12  stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious

13  consequence of his action." *Id.*  Accordingly, when the public entity's policymakers "are on actual or

14  constructive notice that a particular omission in their training program causes [their] employees to

15  violate citizens' constitutional rights, the [public entity] may be deemed deliberately indifferent if the

16  policymakers choose to retain that program." *Id.*  The "policy of inaction" in light of notice that its

17  program will cause constitutional violations "is the functional equivalent of a decision by the [public

18  entity] itself to violate the Constitution." *Id.*  "A less stringent standard of fault for a failure-to-train

19  claim 'would result in de facto respondeat superior liability on municipalities ....'" *Id.*

20          "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'

21  to demonstrate deliberate indifference for purposes of failure to train." *Id.*  "Without notice that a

22  course of training is deficient in a particular respect, decision makers can hardly be said to have

23  deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, at

24  1360.  However, in a "narrow range of circumstances," a pattern of similar violations might not be

25  necessary to show deliberate indifference, and liability could arise from a single incident if the

26  unconstitutional consequences of the failure to train are so patently obvious.  *Id.* at 1361.

27  ───────────────
    [6]  Mr. Hislop did not opine that the alleged lack of officer training caused Mostek's death.  [Hislop Report, pp. 5-6.]
28  Brock's other expert, Dr. Williams, opined that Mostek died as a result of  poor mental health care, not as a result of any
    errors by correctional staff.

1     Neither the allegations of the Second Amended Complaint, nor the evidence and expert

2  opinions in this case, meet the standards of allegation and proof required for a §1983 claim based on

3  a failure to train.  NCDC Correctional Officers are required to complete all training that is required

4  by Title 15 of the CCR.  [Johnson Decl., ¶20.]  Although the Correctional Officers who were deposed

5  in this case may not have remembered all of the specifics of the dates when they were trained or all of

6  the annual training they have received, they all testified that they completed the Corrections Officer

7  Core Course, they received annual required training and they received on the job training with a Field

8  Training Officer when they are first employed by the NCDC.  The Corrections Officer Core Course

9  includes training relating to mental health issues, including suicide risk and prevention in correctional

10  facilities, and as part of their on the job training, the officers are required to  read and become

11  familiar with NCDC Policies and Procedures, including those relating to suicidal inmates.  [Johnson

12  Decl., ¶¶20 and 21 and Exh. L.]

13     Accordingly, there is no basis for a claim based on an alleged lack of policies relating to the

14  management of suicidal inmates, or based on a failure to train Correctional Officers with respect to

15  those policies.  Even if Brock could prove that one or more Correctional Officers ignored their

16  training and failed to follow NCDC policies, such wrongdoing by individual employees cannot serve

17  as a basis for liability against the County under §1983.

18       4.     <u>Brock Has Not Identified Any Conduct By An Official With Final Policy-Making</u>

19             <u>Authority That Caused A Deprivation Of Her Constitutional Rights</u>

20     The final theory of public entity liability under §1983 requires the plaintiff to prove that "'the

21  individual who committed the constitutional tort was an official with final policy-making authority'

22  or that such an official 'ratified a subordinate's unconstitutional decision or action and the basis for

23  it.'"  *Clouthier v. County of Contra Costa, supra*, 591 F.3d at 1250, citing *Gillette v. Delmore, supra*,

24  979 F.2d at 1346-1347.  Liability under this theory will attach only where a deliberate, conscious

25  choice "to follow a course of action is made from among various alternatives by the official or

26  officials responsible for establishing final policy with respect to the subject matter in question."

27  *Clouthier v. County of Contra Costa, supra*, citing *Gillette v. Delmore, supra*, at 1347.

28

1    A mere failure to criticize or reject the conduct of correctional staff will not support a claim

2    under §1983.  "To hold [public entities] liable under section 1983 whenever policymakers fail to

3    overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat

4    superior liability into section 1983 law, [creating an] end run around Monell."  *Clouthier v. County of*

5    *Contra Costa, supra*, at 1253.

6    There are no allegations and there has been no evidence in this case sufficient to support a

7    claim under this theory.

8                                       V.   <u>CONCLUSION</u>

9    For the reasons set forth herein, the County is entitled to an Order granting summary

10   judgment in favor of the County against Brock on Brock's Second Amended Complaint.

11   Alternatively, the County is entitled to an Order granting partial summary judgment in favor of the

12   County against Brock on the following causes of action:

13       1.  First Cause of Action for Violation of Substantive and Procedural Due Process Under 42

14   USC §1983;

15       2.  Second Cause of Action for Failure to Summon Medical Care Under California

16   Government Code §845.6.

17   DATED:  April 17, 2012                    SPAULDING McCULLOUGH & TANSIL LLP
                                               Attorneys for Defendant
18                                             COUNTY OF NAPA

19

20                                             By:  ____/s/ Terry S. Sterling_____
                                                    Terry S. Sterling
21

22

23

24

25

26

27

28