1  Gregory G. Spaulding, Esq. (SBN 106606)
   Terry S. Sterling, Esq. (SBN 106379)
2  SPAULDING McCULLOUGH & TANSIL LLP
   90 South E Street, Suite 200
3  P.O. Box 1867
   Santa Rosa, CA  95402
4  Telephone:     (707) 524-1900
   Facsimile:     (707) 524-1906
5  spaulding@smlaw.com; sterling@smlaw.com

6  Attorneys for Defendants COUNTY OF SONOMA,
   SHERIFF BILL COGBILL and JOSHUA CLAASSEN
7  (incorrectly sued herein as DEPUTY "CLAUSEN")

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10  JULIO PALOMINO,                          Case No.: 11-CV-1329 MEJ

11          Plaintiff,

12      vs.                                  MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT OF MOTION
13  CALIFORNIA FORENSIC MEDICAL GROUP,       FOR SUMMARY JUDGMENT OR, IN THE
    DR. TAYLOR FITHIAN, COUNTY OF            ALTERNATIVE, PARTIAL SUMMARY
14  SONOMA, SHERIFF BILL COGBILL,            JUDGMENT
    DEPUTY "CLAUSEN" AND DOES 1-10,
15                                           Date: December 13, 2012
           Defendants.                       Time: 10:00 a.m.
16                                           Courtroom B, 15th Floor

17                                           Trial Date: July 8, 2013

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................1

II. STATEMENT OF ISSUES .................................................................................................1

III. STATEMENT OF FACTS ................................................................................................1

IV. STATEMENT OF THE CASE .........................................................................................4

V. ARGUMENT .....................................................................................................................4

   A.   Legal Standard for Summary Judgment ........................................................................4

   B.   General Principles Of §1983 Claims .............................................................................5

   C.   Plaintiff Cannot Establish Claims Under §1983 Against The Individual Defendants .............7

       (a)   Plaintiff's Injuries .................................................................................................9

       (b)   The Need For Application Of Force ...................................................................10

       (c)   The Relationship Between The Need For Force And The Amount Of Force Used.......10

       (d)   The Nature Of The Threat Reasonably Perceived By Prison Officers .........................11

       (e)   Efforts Made To Temper The Severity Of A Forceful Response ...................................12

       (f)   Conclusions Of Defendant's Correctional Expert .........................................................12

      3.   Sheriff Cogbill and Deputy Claassen Are Entitled To Qualified Immunity From Plaintiff's Claims ...........14

   D.   Plaintiff Cannot Establish A Claim Under §1983 Against The County .................................15

      1.   There is No Evidence That Plaintiff's Alleged Constitutional Injury Resulted From The Implementation Of An Official County Policy Or Practice, Or From An "Omission" Or "Policy Of Inaction" By The County ...............16

      2.   There Is No Evidence That A County Official With Final Policy-making Authority Ratified A Subordinate's Unconstitutional Action .................................17

VI. CONCLUSION ...............................................................................................................17

i

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Albright v. Oliver*
   510 U.S. 266, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) ........................................................ 4, 5

*Alexander v. City and County of San Francisco*
   29 F.3d 1355 (9th Cir.1994) ........................................................................................................ 10

*Anderson v. Creighton*
   483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ................................................................ 14

*Anderson v. Liberty Lobby, Inc*.
   477 U.S. 242 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..................................................................... 4, 5

*Avalos v. Baca*
   596 F.3d 583, (9th Cir. 2010) ........................................................................................................ 6

*Baker v. McCollan*
   443 U.S. 137, 99 S.Ct. 2689, 2694, fn.3, 61 L.Ed.2d 433 (1979) .................................................. 5

*Blankenhorn v.City of Orange*
   485 F.3d 463 (9th Cir. 2007) ......................................................................................................... 7

*Celotex Corp. v. Catrett*
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ................................................................. 4

*Clouthier v. County of Contra Costa*
   591 F.3d 1232 (9th Cir. 2010) ..................................................................................................... 15

*Doty v. County of Lassen*
   37 F.3d 540 (9th Cir.1994) ........................................................................................................... 17

*Farmer v. Brennan*
   511 U.S. 825, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) ..................................................... 7

*Fayle v. Stapley*
   607 F.2d 858 (9th Cir. 1979) ......................................................................................................... 6

*Gillette v. Delmore*
   979 F.2d 1342 (1992) ................................................................................................................... 17

*Gonzales v. City of Peoria*
   722 F.2d 468 (9th Cir. 1983) .................................................................................................... 6, 15

*Harlow v. Fitzgerald*
   457 U.S. 800 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ................................................................ 14

*Hudson v. McMillian*
   503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ................................................................ 9, 11

*Hutchinson v. U.S*.
   838 F.2d 390 (9th Cir. 1988) ......................................................................................................... 7

ii

*Jackson v. City of Bremerton*
   268 F.3d 646, (9th Cir.2001) ........................................................................................ 14

*Leer v. Murphy*
   844 F.2d 628 (9th Cir. 1988) ......................................................................................... 6

*Los Angeles Police Protective League v. Gates*
   907 F.2d 879 (9th Cir. 1990) ......................................................................................... 7

*Malley v. Briggs*
   475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ................................................. 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ................................................. 5

*Monell v. Department of Social Services*
   436 U.S. 658, 98 S.Ct. 2018, 2036-2038 (1978) ..................................................... 6, 15

*Oklahoma v. Brown*
   520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ............................................... 6

*Oviatt v. Pearce*
   954 F.2d 1470 (9th Cir. 1992) ....................................................................................... 6

*Preschooler II v. Clark County School Board of Trustees*
   479 F.3d 1175 (9th Cir. 2007) ....................................................................................... 7

Price v. Sery
   513 F.3d 962 (9th Cir. 2008) ....................................................................................... 15

*Quintanilla v. City of Downey*
   84 F.3d 353 (9th Cir.1996) .......................................................................................... 15

*Redman v. County of San Diego*
   942 F.2d 1435 (9th Cir. 1991) ....................................................................................... 7

*Richards v. Nielsen Freight Lines*
   602 F.Supp. 1224 (E.D. Cal. 1985), aff'd 810 F.2d 898, (9th Cir. 1987) ...................... 5

*Saucier v. Katz*
   533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ............................................. 14

*Scott v. Henrich*
   39 F.3d 912 (9th Cir.1994) ............................................................................................ 9

*Taylor v. List*
   880 F.2d 1040 (9th Cir. 1989) ....................................................................................... 6

*Thompson v. City of Los Angeles*
   885 F.2d 1439 (9th Cir. 1989) ..................................................................................... 15

*Washington v. Harper*
   494 U.S. 210, 110 S.Ct. 1028, 1039-40, 108 L.Ed.2d 178 (1990) ............................... 16

*Whitley v. Albers*
   475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ................................ 9, 10, 11, 12

*Wilkins v. Ramirez*
    455 F.Supp.2d 1080 (S.D. Cal. 2006) ........................................................................9, 10

**Statutes**

42 USC §1983 ..................................................................................................................passim

FRCP, Rule 56(c) .......................................................................................................................4

**Other Authorities**

Penal Code §242...........................................................................................................................2

Penal Code §422...........................................................................................................................2

Penal Code §594(a)(2)..................................................................................................................2

1    I. <u>INTRODUCTION</u>

2    Plaintiff JULIO PALOMINO alleges that in March 2010, while plaintiff was an inmate at the

3    Sonoma County Main Adult Detention Facility ("MADF" or "Jail"), his left arm was broken as a

4    result of a Correctional Deputy's use of excessive force while removing his handcuffs.  Based on

5    those allegations, plaintiff contends that defendants deprived him of his Constitutional rights in

6    violation of 42 USC §1983 against COUNTY OF SONOMA ("County"), SHERIFF BILL COGBILL

7    ("Sheriff Cogbill") and JOSHUA CLAASSEN (incorrectly sued herein as DEPUTY "CLAUSEN")

8    ("Deputy Claassen").

9    II. <u>STATEMENT OF ISSUES</u>

10    The issues presented by this Motion are as follows:

11    Whether the County deprived plaintiff of his Constitutional rights and if so, whether the

12    County acted with deliberate indifference;

13    Whether Sheriff Cogbill deprived plaintiff of his Constitutional rights and if so, whether he

14    acted with deliberate indifference; and

15    Whether Deputy Claassen deprived plaintiff of his Constitutional rights and if so, whether he

16    acted with deliberate indifference;

17    Whether Sheriff Cogbill is immune from liability for the claims alleged by plaintiff; and

18    Whether Deputy Claassen is immune from liability for the claims alleged by plaintiff.

19    III. <u>STATEMENT OF FACTS</u>

20    In March 2010, plaintiff was an inmate housed in the mental health unit of the Jail.  Plaintiff

21    has a mental illness that reveals itself through symptoms that include erratic behavior,

22    unpredictability, delusions accompanied by mood instability, thoughts of reference, severe anxiety

23    and assaultive behavior.  Plaintiff testified that although he is not a violent person by nature, his

24    thought processes are compromised by his mental illness.  He believes that the incidents that led to

25    criminal charges against him for assault and battery were related to his mental illness.  [Deposition

26    of Julio Palomino ("Palomino Depo"), 15:5-17:13; true and correct copies of cited portions of the

27    Palomino Depo. are attached to the Declaration of Terry S. Sterling ("Sterling Decl.") as Exhibit A.]

28    Although plaintiff has been prescribed medications that help control his symptoms, plaintiff stopped

1

1   taking those medications more than a year before the incident, and he had not taken any

2   medications during his incarceration prior to the incident.  (Palomino Depo, 11:3-12:22; 15:3-16:6).

3          Plaintiff was incarcerated at the MADF from January 27, 2010 to May 12, 2010 on charges

4   brought under Penal Code §242 (battery), §594(a)(2) (vandalism) and §422 (terrorist threat of death

5   or great bodily injury).  [Declaration of Lt. Patti Bennett ("Bennett Decl.,"), ¶2.]  On March 5, 2010,

6   plaintiff was classified as a level "3" administrative segregation inmate with an Internal Behavior

7   Code of "E."  The status level of "3" indicated that plaintiff needed to be supervised by three

8   Correctional Deputies whenever he was out of his cell, and the Internal Behavior Code of "E"

9   indicated that he had obvious psychiatric symptoms, that he presented a high risk potential for

10  violence toward others, and that he was then displaying or had recently displayed violent symptoms

11  indicating a need for maximum supervision and observation.  Based on the Internal Behavior Code

12  of "E," plaintiff was required to wear waist restraints and handcuffs while he was out of his cell.

13  [Bennett Decl., ¶3.]

14          On the day of the incident, plaintiff was removed from his cell to attend a visit.  Based on

15  his classification, plaintiff needed to be placed in restraints before he could be taken to the visiting

16  area of the Jail.  Plaintiff refused to cooperate with the deputies when they tried to put on the

17  restraints; he tried to make his stomach larger so the waist restraints could not be properly applied;

18  he tensed his arms; and he refused to hold his hands still so the handcuffs could be properly applied.

19  Eventually, after plaintiff's continued resistance made it impossible for the deputies to apply the

20  restraints properly, the visit was cancelled and plaintiff was returned to his cell.  [Declaration of

21  Deputy Joshua Claassen ("Claassen Decl.") ¶3 and Incident Report prepared by Deputy Claassen

22  ("Incident Report"); a true and correct copy of the Incident Report is attached to the Claassen Decl.

23  as Exhibit A.]  Consistent with standard procedures, plaintiff was returned to his cell with his hands

24  still cuffed behind his back.  A tether (a nylon rope with clips) that was attached to the handcuffs

25  was passed through the food portal to one deputy stationed outside of the cell, who held the tether

26  and continued to control plaintiff while the cell door was locked.  Plaintiff was then told to put his

27  cuffed hands through the food portal so the deputies outside of the cell could remove the handcuffs.

28  [Claassen Decl., ¶4; Incident Report.]

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF                    Case No. CV 11-0257 EDL
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1    Plaintiff was resistant and uncooperative while the deputies were trying to remove the

2   handcuffs.  He clenched his fist and tried to grab Deputy Claassen's hand, and after the right cuff

3   was removed, plaintiff pulled his right hand through the portal and into the cell in the direction of

4   the sink, creating a safety risk for the deputies.  When plaintiff then started to turn around to face

5   the cell door, Deputy Claassen became concerned that plaintiff might have grabbed a weapon from

6   the sink area, so he placed plaintiff in an "arm bar," a control hold that involves the application of

7   upward pressure on the arm that is extended through the food portal.  Initially, Deputy Claassen did

8   not apply any pressure to the left arm; he told plaintiff to stop struggling and ordered him to put his

9   right arm back through the portal.  Plaintiff refused and turned toward Deputy Claassen, with his

10   right hand out of view.  At the same time, plaintiff pulled on his left arm and twisted his left hand in

11   an attempt to free himself from Deputy Claassen's control.  There was a very real danger of

12   allowing plaintiff to free his left hand, with handcuff attached, from Deputy Claassen's control.

13   Plaintiff would have then had a weapon (the handcuffs and tether) in his cell.  Deputy Claassen

14   began to apply pressure to the arm and he again told plaintiff to stop resisting, to turn around and to

15   put his right arm through the portal.  Again, plaintiff refused and continued to struggle.  Deputy

16   Claassen applied more pressure to the left arm, pushing it against the upper edge of the portal, and

17   he again told plaintiff to stop resisting.  Plaintiff only stopped struggling after he was injured, at

18   which point the left handcuff was removed.  [Claassen Decl., ¶5; Incident Report.]

19    Plaintiff complained of pain in his left elbow, so Deputy Claassen called for medical

20   assistance.  A nurse from California Forensic Medical Group ("CFMG")1 arrived shortly thereafter

21   with ice and medication for plaintiff.  [Claassen Decl., ¶6; Incident Report.]  CFMG arranged for an

22   x-ray of plaintiff's arm, which revealed a fracture of the humerus.  CFMG continued to treat

23   plaintiff throughout the remainder of his incarceration, providing treatment at the Jail and referring

24   plaintiff for treatment by medical specialists outside of the Jail.  [Docket 31, Declaration of John

25   Levin, M.D. filed in support of CFMG's Motion for Summary Judgment, filed on August 22, 2012,

26   ¶¶4(A) through 4(Z).]

27   _____

28   [1] CFMG contracts with the County for the provision of medical care to MADF inmates.  [Declaration of  Lt. Patti Bennett, ¶6.]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF                    Case No. CV 11-0257 EDL
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1

IV. STATEMENT OF THE CASE

2  Plaintiff filed his original Complaint on March 18, 2011, he filed his First Amended Complaint on

3  April 6, 2011 and he filed his Amended Complaint of July 14, 2011 ("Amended Complaint") on

4  July 14, 2011.  The Amended Complaint alleges a single claim against the County defendants for

5  violation of 42 USC §1983.  The Amended Complaint does not clearly explain plaintiff's theory of

6  liability against each of the County defendants, but the only facts alleged as a basis for the claims

7  against the County defendants are the facts pertaining Deputy Claassen's alleged use of excessive

8  force against plaintiff.

9

V. ARGUMENT

10  A.      Legal Standard for Summary Judgment

11          Summary judgment shall be granted if "the pleadings, depositions, answers to

12  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

13  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

14  law."  FRCP, Rule 56(c).  An dispute is "genuine" if there is sufficient evidence for a reasonable

15  jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

16  248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A disputed fact is "material" if it is one that might

17  affect the outcome at trial.  *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 248.  ("Only

18  disputes over facts that might affect the outcome of the suit under the governing law will properly

19  preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

20  not be counted.")

21          A party seeking summary judgment bears the initial burden of informing the court of the

22  basis for its motion, and identifying those portions of the pleadings and discovery responses that

23  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

24  323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  *Celotex* stands for the proposition that summary

25  judgment should be entered against a nonmoving party who fails to make a showing sufficient to

26  establish the existence of an element that is essential to a claim, where the nonmoving party will

27  bear the burden of proving that element at trial.  *Cleotex*, *supra*, at 323.  Once the moving party

28  meets its initial responsibility, the burden shifts to the opposing party to establish the existence of a

4

1  genuine issue as to a material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

2  574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

3        The party opposing a motion for summary judgment cannot meet his burden merely by

4  relying upon the pleadings or his own unsupported allegations; he must proffer evidence of specific

5  facts in the form of affidavits and/or admissible discovery material.  FRCP Rule 56e (opposing

6  party must set forth facts that would be admissible in evidence at trial); *Anderson v. Liberty Lobby,*

7  *Inc., supra,* 477 U.S. at 248 (where a motion for summary judgment is filed by a defendant, the

8  plaintiff "must produce at least some significant probative evidence tending to support the

9  complaint.")

10       In resolving a motion for summary judgment, the evidence of the opposing party is to be

11  believed (*Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 255), and all reasonable inferences are

12  to be drawn in favor of the opposing party (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*,

13  *supra,* 475 U.S. at 587).  However, there must be "evidence" to serve as a basis for "reasonable

14  inferences;" such inferences cannot be drawn out of a vacuum but must be premised on facts

15  proffered by the opposing party.  *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45

16  (E.D. Cal. 1985), aff'd 810 F.2d 898, 902, (9th Cir. 1987).  "When the moving party has carried its

17  burden under Rule 56(c), its opponent must do more than simply show that there is some

18  metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.

19  B.    General Principles Of §1983 Claims

20       "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

21  vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct.

22  807, 811, 127 L.Ed.2d 114 (1994), citing *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689,

23  2694, fn.3, 61 L.Ed.2d 433 (1979).  The Amended Complaint alleges that defendants violated his

24  constitutional rights by using excessive physical force against plaintiff while he was an inmate at the

25  MADF.[2]  A defendant deprives a plaintiff of his or her constitutional rights within the meaning of

26  §1983 if the defendant "does an affirmative act, participates in another's affirmative acts, or omits to

27

28  _____
[2] Defendants assume that it is plaintiff's position that the conduct at issue violated the Eighth Amendment's prohibition against cruel and unusual punishment.

perform an act which he is legally required to do that causes the deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

To establish a §1983 claim against an individual such as Sheriff Cogbill or Deputy Claassen, the plaintiff must prove that the defendant personally participated in the deprivation of constitutional rights. *Avalos v. Baca*, 596 F.3d 583, 587, fn.3 (9th Cir. 2010), *citing Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) and *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). With respect to a supervisor such as Sheriff Cogbill, a supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. *Taylor v. List, supra*, 880 F.2d at 1045. To establish a §1983 claim against a public entity such as the County, the plaintiff must prove that the deprivation of constitutional rights was the result of an act or omission legally attributable to the entity itself. *Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). ("[I]n enacting §1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights"); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

For purposes of a claim under §1983, the acts and omissions of a public entity's employees are not legally attributable to the public entity, and the public entity is not liable for the conduct of its employees, because the doctrine of *respondeat superior* is not applicable to an action under 42 U.S.C. §1983. *Monell v. Department of Social Services*, 436 U.S. 658, 691-694, 98 S.Ct. 2018, 2036-2038 (1978). Instead, where the defendant is a governmental entity, it is responsible under §1983 only when execution of the government's established policy or practice inflicts the constitutional injury. *Monell v. Department of Social Services, supra,* 436 U.S. at 663 n.7, 691 (prison authorities are not liable for the actions of their employees absent some evidence of a policy or practice mandating the action.) *Gonzales v. City of Peoria*, 722 F.2d 468, 479-80 (9th Cir. 1983) (local government liable under §1983 only if the injury is inflicted pursuant to government policy or custom.) Accordingly, plaintiff cannot establish a §1983 claim against the County based merely on the conduct of correctional staff, even if a County employee used excessive force against plaintiff.

1 Finally, not every breach of a government's duties owed to inmates is of constitutional

2 proportions. *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988).  To violate the Eighth

3 Amendment, a plaintiff must demonstrate that the defendant acted with "deliberate indifference."

4 *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994).  In *Farmer*,

5 the Supreme Court described a very strict standard that must be met on order to establish "deliberate

6 indifference."  Mere negligence is not sufficient, and even civil recklessness (a failure to act in the

7 face of an unjustifiably high risk of harm when it is so obvious that it should be known) does not

8 meet the standard.  511 U.S. at 835-837, 114 S.Ct. at 1978-1979.  It is not enough to show that the

9 defendant should have known of the risk, or that a reasonable person would have known of the risk.

10 511 U.S. at 842, 114 S.Ct. at 1981.  Instead, the plaintiff must prove recklessness in the criminal

11 sense.  This is a subjective standard; the plaintiff must prove that a defendant deliberately

12 disregarded a risk of harm of which the defendant was actually aware.  511 U.S. at 838-842, 114

13 S.Ct. at 1979-1981.

14 C. <u>Plaintiff Cannot Establish Claims Under §1983 Against The Individual Defendants</u>

15  1. <u>There Is No Basis For The Claim Against Sheriff Cogbill</u>

16 As set forth above, a supervisor such as Sheriff Cogbill is liable under 42 USC §1983, only

17 if the supervisor was personally involved in the alleged deprivation of the plaintiff's constitutional

18 rights, or there was a sufficient causal connection between the supervisor's alleged wrongful

19 conduct and the constitutional violation at issue.  *Redman v. County of San Diego*, 942 F.2d 1435,

20 1446 (9th Cir. 1991).  A "sufficient causal connection" may be found by a supervisor's acquiescence

21 in the constitutional deprivation which is the basis for the complaint, or by the supervisor's own

22 conduct or omission in the training, supervision, or control of subordinates.  *Preschooler II v. Clark*

23 *County School Board of Trustees,* 479 F.3d 1175, 1183, (9th Cir. 2007); *Los Angeles Police*

24 *Protective League v. Gates,* 907 F.2d 879, 894 (9th Cir. 1990);  *Blankenhorn v.City of Orange,* 485

25 F.3d 463, 485-486  (9th Cir. 2007).

26 The Amended Complaint does not allege that Sheriff Cogbill was personally involved in in

27 incident at issue in this case.  Instead, on the basis of information and belief, plaintiff alleges: (1)

28 that Sheriff Cogbill and the County "ratified and adopted the conduct of Deputy 'Clausen,' with

7

1   deliberate and gross indifference to the rights of plaintiff" [Amended Complaint, ¶14]; (2) that

2   Sheriff Cogbill and the County "had prior notice and knowledge of other incidents involving the use

3   of excessive force and the unjustified use of force by Deputy 'Clausen' and other Deputies of the

4   Sonoma County Sheriff's Department" [Amended Complaint, ¶15]; (3) that Sheriff Cogbill and the

5   County "failed to adequately train, supervise and discipline Deputies for the Sonoma County

6   Sheriff's Department with respect to encounters with prisoners displaying acute symptoms and with

7   respect to the use of force" [Amended Complaint, ¶15]; (4) that Sheriff Cogbill and the County "had

8   actual and/or constructive knowledge that the failure to adequately train, supervise and discipline

9   deputies regarding encounters with prisoners displaying symptoms of acute mental illness created a

10  substantial risk of injury to such prisoners and to the Deputies themselves, and of violations of

11  personal and constitutional rights" [Amended Complaint, ¶16]; and (5) that defendants (including

12  Sheriff Cogbill) were deliberately indifferent to the substantial risk of violating prisoners' rights"

13  [Amended Complaint, ¶16].

14          Despite the allegations of the Amended Complaint, plaintiff has conceded that he is not

15  aware of any factual support for his claims against Sheriff Cogbill.  The County propounded

16  interrogatories on plaintiff, asking him to state all facts that support each of the allegations set forth

17  above; to identify all persons who have knowledge of those facts; and to identify all documents that

18  support those facts.  [Special Interrogatories to Plaintiff (Set One) propounded by County of

19  Sonoma ("Interrogatories"), Interrogatories Nos. 1 through 6 and 8 through 16; a true and correct

20  copy of the Interrogatories is attached to the Sterling Decl. as Exhibit B.]  In response to each of

21  those Interrogatories, plaintiff responded "None," indicating that he is not aware of any facts,

22  witnesses or evidence which support the allegations against Sheriff Cogbill.  [Plaintiff's Responses

23  to Interrogatories Nos. 1 through 6 and 8 through 16; a true and correct copy of plaintiff's

24  Responses to Defendant's Special Interrogatories, Set One ("Responses") is attached to the Sterling

25  Decl. as Exhibit C.]

26          In sum, there is no evidence that Sheriff Cogbill had any direct involvement in the incident

27  at issue, there is no evidence of any causal connection between any conduct by Sheriff Cogbill and

28  the alleged use of excessive force against plaintiff; there is no evidence of deliberate indifference by

8

1   Sheriff Cogbill; and there is no evidence to support the allegations of the Amended Complaint as

2   they pertain to Sheriff Cogbill.  Accordingly, Sheriff Cogbill is entitled to summary judgment in his

3   favor.

4            2.        The Excessive Force Claim Against Deputy Claassen Is Without Merit

5            When prison officials are accused of using excessive force, the core judicial inquiry is

6   "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

7   and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d

8   156 (1992); *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).  The

9   "malicious and sadistic" standard, as opposed to the "deliberate indifference" standard applicable to

10  most Eighth Amendment claims, is applied to excessive force claims because prison officials

11  generally do not have time to reflect on their actions in the face of risk of injury to inmates or prison

12  employees.  Officers are not required to use the least intrusive means available; they simply must

13  act within the range of reasonable conduct.  *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994).

14  *Whitley v. Albers, supra*, 475 U.S. at 320-21, 106 S.Ct. 1078.  Law enforcement must be extended

15  considerable deference in making the choices regarding the amount of force required in a given

16  instance.  *Whitley v. Albers, supra,* 475 U.S. at 320.

17           In determining whether force was excessive, the following factors are relevant: (1) the

18  extent of injuries; (2) the need for application of force; (3) the relationship between the need for

19  force and the amount of force used; (4) the nature of the threat reasonably perceived by prison

20  officers; and (5) efforts made to temper the severity of a forceful response.  *Hudson v. McMillan,*

21  *supra*, 503 U.S. at 7, 112 S.Ct. 995.

22                    (a)        Plaintiff's Injuries

23           Defendants do not deny that plaintiff was injured as a result of the incident; broke his arm

24  by struggling against the correctional deputy's efforts to remove his restraints.  Although, the extent

25  of a prisoner's injury may be relevant in determining whether excessive force was used, it is not

26  decisive.  *Wilkins v. Ramirez, supra*, 455 F.Supp.2d at 1091.  Under the circumstances of this case,

27  the other relevant factors outweigh the evidence of plaintiff's injury, and they support a finding that

28  excessive force was <u>not</u> used.

9

(b)    The Need For Application Of Force

The Ninth Circuit has held that "the force that was applied must be balanced against the need for that force: it is the need for force which is at the heart of the [excessive force determination]." *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir.1994).  In *Wilkins v. Ramirez*, 455 F.Supp.2d 1080, 1091 (S.D. Cal. 2006), the Court determined that there was a need for force because the facts showed that as correctional staff were trying to move the plaintiff from one area of the jail to another, the plaintiff was resisting and struggling against the officers, and the officers exerted force in order to restrain plaintiff, not to maliciously and sadistically inflict pain on him.  The plaintiff's allegation that he was beaten for no reason was not sufficient to create a genuine issue of material fact so as to defeat summary judgment.  The *Wilkins* Court noted that the plaintiff's allegation was uncorroborated, while in contrast, the defendants submitted incident reports stating that plaintiff was resisting.  *Id.* at 1091-1092.

The facts are similar in this case.  Deputy Claassen's Incident Report indicates that plaintiff was refusing to obey the deputy's instructions, resisting the deputy's efforts to remove the handcuffs, trying to grab the deputy's hand and pulling his own uncuffed hand into his cell in a way that suggested plaintiff might be reaching for a weapon.  Plaintiff's version of the events of that day is not only uncorroborated by any other evidence, it is inherently suspect.  Plaintiff testified that his thought processes are compromised when his mental illness is not controlled with medication, and although plaintiff had been prescribed medications to control the symptoms of his mental illness, he had stopped taking those medications more than a year before the day of the incident.  Plaintiff confirmed that he had not taken any of those medications on that day.  Therefore, plaintiff's perception and understanding of the events at issue are not reliable.

(c)    The Relationship Between The Need For Force And The Amount Of Force Used

In analyzing the relationship between the need for force and the force used, the Court in *Whitley v. Albers, supra*, emphasized that simple overreaction by an officer is not enough to establish an Eighth Amendment violation.  "It is obduracy and wantonness, not inadvertence or

10

1   error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments

2   Clause, whether that conduct occurs in connection with establishing conditions of confinement,

3   supplying medical needs, or restoring official control over a tumultuous cellblock. The infliction of

4   pain in the course of a prison security measure, therefore, does not amount to cruel and unusual

5   punishment simply because it may appear in retrospect that the degree of force authorized or

6   applied for security purposes was unreasonable, and hence unnecessary in the strict sense. *Whitley*

7   *v. Albers, supra*, 475 U.S. at 319, 106 S.Ct. 1078.

8          There is no evidence of "obduracy and wantonness" in this case.  In light of the security

9   concerns and the risk of harm that would have arisen if plaintiff had been able to take control of the

10  handcuffs and tether, it was necessary to remove the left handcuff from plaintiff's wrist.  Given

11  plaintiff's refusal to follow instructions and his physical resistance to correctional staff, it became

12  necessary to use some force to accomplish that task.  Here, the amount of force was only increased

13  after plaintiff repeatedly refused to cooperate with correctional staff.  Deputy Claassen's conduct

14  was reasonable based on the situation presented at the time, regardless of how his actions might

15  appear in hindsight.

16          (d)      The Nature Of The Threat Reasonably Perceived By Prison Officers

17          Another relevant inquiry for determining whether an Eighth Amendment excessive force

18  violation occurred is "the extent of the threat to the safety of staff and inmates, as reasonably

19  perceived by the responsible officials on the basis of the facts known to them." *Whitley v. Albers,*

20  *supra*, 475 U.S. at 321, 106 S.Ct. 1078. The *Whitley* Court cautioned that in weighing this factor,

21  courts should be mindful that "in making and carrying out decisions involving the use of force to

22  restore order in the face of a prison disturbance, prison officials undoubtedly must take into account

23  the very real threats the unrest presents to inmates and prison officials alike, in addition to the

24  possible harms to inmates against whom force might be used." *Whitley v. Albers, supra,* 475 U.S. at

25  320, 106 S.Ct. 1078. Moreover, "[d]espite the weight of these competing concerns, corrections

26  officers must make their decisions in haste, under pressure, and frequently without the luxury of a

27  second chance." *Hudson v. McMillian, supra*, 503 U.S. at 6, 112 S.Ct. 995.  As set forth above,

28

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF                    Case No. CV 11-0257 EDL
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1   plaintiff's conduct during the incident, together with his history of erratic and assaultive behavior,

2   presented a threat of potential harm to himself and to correctional staff that needed to be addressed.

3            (e)        <u>Efforts Made To Temper The Severity Of A Forceful Response</u>

4         Deputy Claassen tried to temper the severity of his efforts to remove plaintiff's restraints.

5   He repeatedly warned plaintiff to stop resisting, not to turn into the cell, and to put his hands

6   through the food portal.  Only after plaintiff repeatedly ignored the deputy's instructions and

7   continued to struggle did Deputy Claassen place plaintiff in an "arm bar" control hold.  Even then,

8   Deputy Claassen did not immediately apply pressure to the arm; he gave plaintiff more time to

9   comply with the instructions, and only gradually increased pressure on the hold when plaintiff

10   repeatedly refused to comply.

11         Deputy Claassen's efforts to temper his response were comparable to those of the

12   correctional officers in *Whitley v. Albers, supra.*  The *Whitley* Court noted that during the course of

13   the incident, the officers gradually increased the amount of force they used in response to the

14   plaintiff's resistance.  They repeatedly warned plaintiff to stop resisting, but the plaintiff ignored the

15   warnings and began to physically struggle with the officers, resulting in the use of an increased

16   level of force.  The *Whitley* Court found the officers' efforts to minimize the amount of force to be

17   sufficient to defeat any claim of excessive force; the same is true in this case.

18            (f)        <u>Conclusions Of Defendant's Correctional Expert</u>

19         In this case, given plaintiff's history of assaultive behavior, the charges against him, his

20   classification level and his behavior at the time of the incident, the force applied by Deputy

21   Claassen was not excessive.  [Declaration of Joseph Caruso ("Caruso Decl."), ¶6.]  Plaintiff does

22   not deny that he had a history of being uncooperative with the deputies (Palomino Depo, 17:7-13,

23   18:25-19:16), and he concedes that on the day of the incident, his communications with the deputies

24   consisted of "deranged rants" (Palomino Depo, 23:16-24:6).  Deputy Claassen's Incident Report

25   indicates that at the time of the incident, plaintiff was not only refusing to follow Deputy Claassen's

26   instructions, he was struggling aggressively with Deputy Claassen.  Plaintiff was clenching his fist,

27   trying to grab Deputy Claassen's hand, and pulling and twisting his left arm and hand in an effort to

28   get away from the deputy.  In addition, as soon as his right handcuff was removed, plaintiff pulled

12

1   his right hand into his cell and reached toward the sink, possibly to grab something that could be

2   used as a weapon.  [Incident Report.]

3          Under the circumstances of this case, Deputy Claassen's priorities were to ensure that

4   plaintiff did not get loose, and to remove plaintiff's remaining handcuff.  [Caruso Decl., ¶5.]  In

5   light of plaintiff's history and his behavior at the time of the incident, plaintiff presented a safety

6   risk and Deputy Claassen had reasonable cause for concern.  Accordingly, when plaintiff continued

7   to disregard Deputy Claassen's instructions to stop resisting and to put his right arm through the

8   food portal, it was reasonable for Deputy Claassen to place plaintiff in an "arm bar" control hold.

9   [Caruso Decl., ¶6.]  Deputy Claassen did not apply the hold with excessive force; initially, he did

10  not apply pressure to the arm bar, but gave plaintiff a further chance to comply with the instructions

11  to stop resisting and to put his right arm back through the portal.  Only after plaintiff continued to

12  resist and to ignore instructions did Deputy Claassen begin to apply pressure to the hold.  [Caruso

13  Decl., ¶7.]

14         Waiting for plaintiff to calm down before removing the handcuff would not have been an

15  acceptable alternative.  The deputies could not leave plaintiff alone because the left handcuff was

16  attached to a tether held by one of the deputies, and if the deputy had released the tether, plaintiff

17  could have pulled it into his cell and used the handcuffs and tether as a weapon, either against the

18  deputies or against himself.  [Claassen Decl., ¶8; Caruso Decl., ¶8.]  Once plaintiff had a weapon in

19  his cell, it would have been necessary to call in the Specialized Emergency Response Team to

20  conduct a forced cell removal, a potentially dangerous maneuver that would have required a

21  facility-wide lockdown.  [Bennett Decl., ¶¶4-5; Claassen Decl., ¶8; Caruso Decl., ¶8.]

22         In sum, based on plaintiff's history and behavior, the use of an arm bar hold to remove the

23  handcuff was reasonable, and Deputy Claassen used the arm bar hold in a reasonable manner.

24  Deputy Claassen did not use excessive use in his efforts to remove plaintiff's restraints on March 5,

25  2010, and there is no evidence that Deputy Claassen acted maliciously, sadistically or for the

26  purpose of causing plaintiff harm.

27

28

3.   Sheriff Cogbill and Deputy Claassen Are Entitled To Qualified Immunity From Plaintiff's Claims

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

If a violation can be made out, the court must determine if that right was "clearly established" at the time of the violation.  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition ...." *Id.*  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S.Ct. 2151 (citation omitted); *see also, Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  Even if the plaintiff has alleged a violation of a clearly established right, the government official is nevertheless entitled to qualified immunity if he could have "reasonably but mistakenly believed that his ... conduct did not violate the right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.2001); *see also Saucier v. Katz, supra,* 533 U.S. at 205, 121 S.Ct. 2151.

As set forth above, neither of the individual defendants is responsible for any act or omission that constituted a violation of plaintiff's constitutional rights.  Even if Deputy Claassen's use of an arm bar control hold was found to violate plaintiff's constitutional rights, it was not a "clearly established" violation under applicable law.  Finally, there is no evidence that the either of the individual defendants did anything, or failed to do anything, without having a reasonable belief that their conduct did not violate plaintiff's constitutional rights.

14

1    D.      Plaintiff Cannot Establish A Claim Under §1983 Against The County

2            Where the defendant is a governmental entity, it is responsible under §1983 only when

3    execution of the governmental entity's established policy or practice inflicts the constitutional

4    injury. *Monell v. Department of Social Services, supra,* 436 U.S. at 663 n.7, 691 (prison authorities

5    are not liable for the actions of their employees absent some evidence of a policy or practice

6    mandating the action); *Gonzales v. City of Peoria*, 722 F.2d 468, 479-80 (9th Cir. 1983) (local

7    government liable under §1983 only if the injury is inflicted pursuant to government policy or

8    custom.)  Therefore, plaintiff must prove that there was an official policy or longstanding practice

9    of the County that, by its implementation, resulted in the constitutional injury allegedly suffered by

10   him.

11           There are three ways that a governmental policy or practice can give rise to public entity

12   liability under §1983.  First, a public entity may be liable where implementation of an official

13   policy or practice inflicts the constitutional injury.  *Clouthier v. County of Contra Costa*, 591 F.3d

14   1232, 1249 (9th Cir. 2010).  To prevail on this theory, a plaintiff must provide evidence of either a

15   specific policy, or a pre-existing, longstanding practice or custom that constitutes the standard

16   operating procedure of the public entity, that, by its implementation, resulted in a constitutional

17   injury.  *Clouthier v. County of Contra Costa, supra,* 591 F.3d at 1249 and 1251; Price v. Sery, 513

18   F.3d 962, 966 (9th Cir. 2008); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir.1996);

19   *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1444 (9th Cir. 1989).  The second way to show

20   public entity liability under §1983 is to show an "omission" or "policy of inaction" of the public

21   entity, when such omission amounts to the local government's official policy.  *Clouthier v. County*

22   *of Contra Costa, supra,* 591 F.3d at 1249; *Connick v. Thompson, supra,* 131 S.Ct. at 1359.  Finally,

23   a public entity may be held liable under §1983 when an official with final policy-making authority

24   ratified both a subordinate's unconstitutional action and the basis for it.  *Clouthier v. County of*

25   *Contra Costa, supra,* 591 F.3d at 1250.

26

27

28

1.   <u>There is No Evidence That Plaintiff's Alleged Constitutional Injury Resulted From</u>
<u>The Implementation Of An Official County Policy Or Practice, Or From An</u>
<u>"Omission" Or "Policy Of Inaction" By The County</u>

In this case, there is no evidence that plaintiff's injury resulted from either the implementation of an official County policy or an established practice or custom, or from an "omission" or "policy of inaction" of the County.  The Interrogatories asked plaintiff to identify all official County policies or practices, and all omissions amounting to either an official County policy or practice, that plaintiff contends deprived him of his constitutional rights while he was an inmate at the MADF.  [Interrogatories Nos. 23 through 26.]  In response, the only policy, practice or omission identified by plaintiff is the County's "policy [or practice] to house mentally ill person [sic] in MADF" (alternatively described as the County's  "policy [or practice] to not house mentally ill person [sic] in a mental health facility").  [Responses to Interrogatories Nos. 23 through 26.]

It is not clear if plaintiff is claiming that it is unconstitutional for any mentally ill person to be housed in a jail instead of a mental health facility, or if he is claiming that his constitutional rights were violated by the decision to house <u>him</u> (as opposed to mentally ill persons in general) at the MADF.  Either way, this is a new claim that was not articulated in the Amended Complaint, and has never been mentioned before.  Plaintiff has not complained that the mental health care he received at the jail was negligent or improper.  To the contrary, in an email to defendants' attorney, plaintiff's attorney expressly stated that "[plaintiff's] mental health is not an issue in this litigation." [Sterling Decl., ¶5 and Exhibit D.]

Moreover, if plaintiff is claiming that it is unconstitutional for any mentally ill person to be housed in a jail, plaintiff is simply wrong.  There are numerous court decisions that address the constitutionality of various aspects of the mental health care provided by jails and prisons; these cases would not exist if persons with mental illness could not constitutionally be housed in a jail under any circumstances.  The mere fact that a mentally ill individual is housed in a jail or prison does not, in and of itself, violate the individual's constitutional rights.  (*Washington v. Harper*, 494 U.S. 210, 227, 110 S.Ct. 1028, 1039-40, 108 L.Ed.2d 178 (1990) (Fourteenth Amendment permits the State to treat an inmate who has a serious mental illness); *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th

1   Cir.1994) (Eighth and Fourteenth Amendments guarantee that inmates and detainees receive

2   constitutionally adequate mental health care in jail).

3        If plaintiff is claiming that his constitutional rights were violated by the decision to house

4   him, specifically, at the MADF, not only would such a claim be new and inconsistent with statements

5   made by plaintiff's attorney, but such a claim would also not be viable under §1983 because it does

6   not allege injury resulting from the implementation of a County policy or practice.  Even if a mistake

7   had been made in connection with plaintiff's housing, that mistake would not be evidence of an

8   official County policy or practice.  Evidence of random acts or isolated events is not sufficient to

9   prove that a particular practice is "so permanent and well settled as to constitute a 'custom or usage'

10  with the force of law."  *Gillette v. Delmore*, 979 F.2d 1342, 1329 and 1348-1349 (1992).

11       2.        There Is No Evidence That A County Official With Final Policy-making Authority

12                 Ratified A Subordinate's Unconstitutional Action

13       Finally, there is no any evidence that any official with final policy-making authority ratified

14  the alleged use of excessive force.  In his Responses to the Interrogatories, plaintiff conceded that

15  he is not aware of any facts, witnesses or evidence that support the allegation that the County

16  ratified and adopted the conduct of Deputy Claassen [Plaintiff's Responses to Interrogatories Nos.

17  1, 2 and 3], nor was he able to identify any officials with final policy-making authority who

18  approved any unconstitutional acts toward him by County employees.  [Response to Interrogatory

19  No. 29].

20                              VI. CONCLUSION

21       For the reasons set forth above, each of the defendants is entitled to an Order granting

22  summary judgment in their favor.

23  DATED:  October 31, 2012               Respectfully submitted,

24                                          SPAULDING McCULLOUGH & TANSIL LLP
                                            Attorneys for Defendants COUNTY OF SONOMA,
25                                          SHERIFF BILL COGBILL and JOSHUA
                                            CLAASSEN (incorrectly sued herein as DEPUTY
26                                          "CLAUSEN")

27

28                                          By:   */s/Terry S. Sterling*_____
                                                  Terry S. Sterling

                                        17